# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

|  |  |
|---|---|
| LISA BOSMAN, On Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HARLEY-DAVIDSON, INC., the ADMINISTRATIVE COMMITTEE OF HARLEY-DAVIDSON, INC., HAROLD A. SCOTT, JAMES M. BROSTOWITZ, JAMES L. ZIEMER, GAIL A. LIONE, BARRY K. ALLEN, RICHARD I. BEATTIE, JEFFREY L. BLEUSTEIN, GEORGE H. CONRADES, JUDSON C. GREEN, DONALD A. JAMES, SARA L. LEVINSON, GEORGE L. MILES, JR., and JAMES A. NORLING, <br><br> Defendants. | CIVIL ACTION NO.: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |

Plaintiff Lisa Bosman, a participant in the Harley-Davidson Retirement Savings Plan for Salaried Employees (the "Plan")[1], on behalf of herself and a Class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.       Plaintiff Lisa Bosman ("Bosman" or "Plaintiff") is a former employee of Harley-Davidson, Inc. ("Harley-Davidson" or the "Company"). Through her employment with Harley-Davidson, Bosman saved for retirement by participating in the Plan. Bosman's retirement

---

[1] Plaintiff also brings this suit on behalf of the Harley-Davidson Retirement Savings Plan for Kansas City Hourly Bargaining Unit Employees, the Harley-Davidson Retirement Savings Plan for Milwaukee and Tomahawk Hourly Bargaining Unit Employees, the Harley-Davidson Retirement Savings Plan for York Hourly Bargaining Unit Employees, the Buell Motorcycle Company Retirement Savings Plan, and the participants and beneficiaries of those plans. According to the Form 11-Ks filed by Harley-Davidson with the Securities and Exchange Commission for the year ending December 31, 2004, the assets of all five of Harley-Davidson's retirement savings plans are held by the Harley-Davidson Retirement Savings Plan Master Trust (the "Master Trust").

portfolio pursuant to the Plan included Harley-Davidson common stock ("Harley-Davidson Stock" or "Company Stock"), which was one of the investment options offered by the Plan. As described herein, Bosman, along with other Plan participants and beneficiaries that held Harley-Davidson Stock, collectively suffered millions of dollars of losses in their retirement portfolios due to the acts of the Defendants, who breached their fiduciary obligations imposed by the Employee Retirement Income Security Act ("ERISA") and owed to all the Plan participants and beneficiaries, including Plaintiff.

2.     Plaintiff brings this suit as a civil enforcement action under Section 502 of the ERISA, 29 U.S.C. § 1132, against the Plan fiduciaries for relief on behalf of the Plan.

3.     The Plan is a defined contribution retirement plan that is intended to qualify under Section 401(a) of the Internal Revenue Code of 1986 and is subject to the provisions of ERISA. From July 14, 2004 through April 20, 2005 (the "Class Period"), the Plan significantly invested in and held heavy concentrations of the Harley-Davidson Stock.

4.     Plaintiff was an employee of Harley-Davidson and a participant in the Plan during the Class Period. Plaintiff's investment portfolio pursuant to the Plan included Harley-Davidson Stock during the Class Period.

5.     Defendants, as fiduciaries of the Plan, violated ERISA and breached their duties to Plaintiff and to the other participants and beneficiaries of the Plan in connection with the Plan's investment in and holdings of Harley-Davidson Stock.

6.     Throughout the Class Period, the Plan's investment purchases and holdings were overconcentrated in Harley-Davidson Stock and the Plan failed to offer a suitable array of investment options to its participants. As of December 31, 2004, near the middle of the Class Period, approximately 35% of the Plan's assets were invested in Company Stock.

7.     Moreover, during the Class Period. Defendants violated ERISA because it was imprudent for the Plan to purchase or hold Harley-Davidson Stock because, among other reasons, the stock was trading at artificially high prices due to the Company's public statements as to motorcycle shipments and earnings growth, which statements were false and later restated.

8.     During the Class Period. Defendants neither properly monitored the Plan's investment in Harley-Davidson Stock nor provided accurate information to Plan participants and beneficiaries concerning Harley-Davidson's financial performance. Because of the Defendants' failure to provide accurate information, Plan participants lacked the proper knowledge to make informed decisions concerning investments.

9.     In further breach of their fiduciary duties. Defendants had divided loyalties between maintaining a high price for Company Stock, in part because of their own holdings and sales of Harley-Davidson Stock and in part because of their positions as directors or senior officers of the Company, and the interests of the Plan participants and beneficiaries, which should have included the timely receipt of accurate information concerning the Company's financial performance and diversification out of investments, like Harley-Davidson Stock, that were overvalued.

10.     Upon Harley-Davidson's public disclosure on April 13, 2005 that its earnings growth and planned motorcycle shipments were overstated. the price of Company Stock plummeted. Harley-Davidson Stock fell from $58.77 per share to $48.93 per share. Over the next several trading days, Harley-Davidson Stock continued to fall to a low of $45.42 per share. Plaintiff. and all Plan participants. who had acquired and held Company Stock. suffered as the value of their retirement portfolios invested pursuant to the Plan dropped precipitously in line with this 23% drop in the price of Company Stock.

411159

3

11. Defendants are liable under ERISA to restore losses sustained by the Plan resulting from the breach of their fiduciary obligations.

12. In addition, because much of the information and documents on which Plaintiffs' claims are based are solely within the knowledge and possession of Defendants, certain of Plaintiffs' allegations are by necessity upon information and belief.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

14. Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more defendants reside or may be found, and/or where the acts and transactions alleged herein, including the administration of the Plan, occurred.

## PARTIES

Plaintiff

15. Plaintiff Lisa Bosman is a former employee of Harley-Davidson and is a participant in the Plan pursuant to Section 3(7) of ERISA, 29 U.S.C. § 1102(7). Plaintiff held Harley-Davidson Stock in her retirement portfolio pursuant to the Plan during the Class Period.

Defendants

16. Defendant Harley-Davidson's principal place of business is 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208. According to Harley-Davidson's 2004 annual report, the Company primarily operates in two business segments: motorcycles, including related products, and financial services. Harley-Davidson is the parent company for the group of companies doing business as Harley-Davidson Motor Company ("HDMC"), Buell Motorcycle Company

411159                                              4

("BMC"), and Harley-Davidson Financial Services ("HDFS"). HDMC and BMC both manufacture and sell motorcycles, as well as sales of motorcycle parts, accessories, apparel, and general merchandise. HDFS provides wholesale and retail financing and insurance programs primarily to HDMC and BMC dealers and customers.

17.     Throughout the Class Period, Defendant the Administrative Committee of Harley-Davidson -- aka Harley-Davidson Motor Company Retirement Plans Committee (the "Administrative Committee") -- was the Plan administrator and charged with the general administration of the Plan. The identities of all the members of the Administrative Committee are within the exclusive knowledge of certain Defendants, such as Harley-Davidson and members of Harley-Davidson's Board of Directors (the "Board"). However, upon information and belief, members of the Administrative Committee during the Class Period included the following:

      (a)      Defendant Harold A. Scott ("Scott"), the Company's Vice President of Human Resources;

      (b)      Defendant James L. Ziemer ("Ziemer"), the Company's Chief Financial Officer during the Class Period (*see, infra,* at ¶ 17(j));

      (c)      Defendant James M. Brostowitz ("Brostowitz"), the Company's Treasurer; and

      (d)      Defendant Gail A. Lione ("Lione"), the Company's General Counsel.

18.     The members of the Board during the Class Period are also named as defendants. They are:

      (a)      Defendant Barry K. Allen ("Allen") has served as a director of the Company from 1992 to the present, and served on the Board's Human

Resources Committee and as Chairman of the Board's Nominating and Corporate Governance Committee.

(b)    Defendant Richard I. Beattie ("Beattie") has served as a director of the Company from 1996 to the present, and served on the Board's Audit Committee and the Nominating and Corporate Governance Committee.

(c)    Defendant Jeffrey L. Bleustein ("Bleustein") has served as a director of the Company from 1996 to the present. Bleustein was also the Chief Executive Officer of the Company throughout the Class Period and also served as Chairman of the Board throughout the Class Period.

(d)    Defendant George H. Conrades ("Conrades") has served as a director of the Company from 2002 to the present, and served as Chairman of the Board's Human Resources Committee and as a member of the Nominating and Corporate Governance Committee.

(e)    Defendant Judson C. Green ("Green") has served as a director of the Company from December, 2004 to the present, and also served on the Board's Audit Committee and the Nominating and Corporate Governance Committee.

(f)    Defendant Donald A. James ("James") has served as a director of the Company from 1991 to the present.

(g)    Defendant Sara L. Levinson ("Levinson") has served as a director of the Company from 1996 to the present, and served on the Board's Human Resources Committee and the Nominating and Corporate Governance Committee.

(h)     Defendant George L. Miles, Jr. ("Miles") has served as a director of the
Company from 2002 to the present, and served on the Board's Audit
Committee and the Nominating and Corporate Governance Committee.

(i)     Defendant James A. Norling ("Norling") has served as a director of the
Company from 1993 to the present, and served as Chairman of the
Board's Audit Committee and the Nominating and Corporate Governance
Committee.

(j)     Defendant James L. Ziemer ("Ziemer") has served as a director of the
Company from December, 2004 to the present. During the Class Period,
Ziemer served as Vice President and Chief Financial Officer of Harley-
Davidson, and, effective April 30, 2005, was promoted to Chief Executive
Officer.

Unknown Fiduciaries

19.     There are fiduciaries of the Plan whose identities are currently unknown to
Plaintiff as that information is within the exclusive knowledge of the Defendants. Once their
identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE PLAN

20.     The Plan is an "employee pension benefit plan," as defined by Sections 3(2)(A)
and 3(3) of ERISA, 29 U.S.C. §§ 1002(2)(A) and 1002(3). The Plan is not a party to this action.
Pursuant to ERISA, however, the relief requested is for the benefit of the Plan. The Plan
Sponsor Identification Number is 39-1805420 and the Plan Number is 002.

21.     Throughout the Class Period, the Plan has offered the participants the option of
investing in Harley-Davidson Stock.

411159                                     7

22. During the Class Period, Harley-Davidson frequently made certain matching contributions in the form of Harley-Davidson Stock. The Company imposed restrictions upon Plan participants' ability to diversify such matching contributions out of Company Stock. Harley-Davidson prohibited Plan participants from transferring or directing to any other investment option the Company's matching contribution, which was made in the form of Company Stock, until either the participant became fully vested in such amounts, which typically required at least three years of vesting service, or the participant reached the age of 55.

23. As of December 31, 2004, more than 35% of the assets of the Master Trust were invested in Company Stock.

## DEFENDANTS' FIDUCIARY STATUS

Defendant Harley-Davidson

24. Throughout the Class Period, Harley-Davidson, through its subsidiary HDMC, was the Plan sponsor, a fiduciary of the Plan within the meaning of ERISA, and acted within its capacity as a Plan fiduciary. For example, Harley-Davidson chose to make matching contributions in the form of Company Stock, and had and exercised sole discretion as to calculating Earnings Before Interest and Taxes, which was used to determine the amount of the matching contribution. Harley-Davidson had (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. Harley-Davidson at all times acted through its officers, employees, and members of its Board of Directors, who performed Plan-related fiduciary functions in the course and scope of their employment and/or service to the Company.

25. Harley-Davidson had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan-related activities. Harley-Davidson,

through its Board of Directors, executive officers, or otherwise, had the authority and discretion to hire and terminate said officers and employees. Harley-Davidson, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers, and other employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to participants in the Plan and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to Harley-Davidson under the doctrine of *respondeat superior*, and Harley-Davidson is liable for such actions.

The Administrative Committee Defendants

26.     Throughout the Class Period, Defendant the Administrative Committee was the Plan administrator, charged with the general administration of the Plan, and thus a Plan fiduciary. As such, all of the members of the Administrative Committee are also Plan fiduciaries.

27.     Upon information and belief, the Administrative Committee was charged with the responsibility and authority to undertake all actions necessary or advisable for the proper administration of the Plan, including selecting the investment options offered by the Plan and providing Plan participants and beneficiaries with all information required to be provided by ERISA.

28.     The Administrative Committee and each of its members was a fiduciary of the Plan within the meaning of ERISA in that the committee and its members had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets. The Administrative Committee was also vested with the authority to communicate information to

Plan participants. Further, as alleged herein, the Administrative Committee acted within its fiduciary capacity.

The Director Defendants

29.     The Board had the ultimate authority to manage the business and affairs of Harley-Davidson. Because Harley-Davidson was, as alleged above, a fiduciary of the Plan during the Class Period, so, necessarily, was the Board and its members.

30.     Upon information and belief, Harley-Davidson's Board had the authority to appoint and remove members of the Administrative Committee. Upon information and belief, the Board had the authority to appoint and remove members of its various committees, including the Board's Human Resources Committee, which also acted as a fiduciary to the Plan as set forth in the following paragraph. The Board had ultimate authority to amend, modify, or terminate the Plan. By appointing and removing the foregoing Plan fiduciaries, and by approving the investment options offered by the Plan, the Board itself acted in a fiduciary capacity toward the Plan and therefore all Board members are Plan fiduciaries because they had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

31.     The Board's Human Resources Committee was responsible for reviewing overall compensation policies for employees and all equity-based compensation plans, which, upon information and belief, included the Plan and the Company matching contribution component of the Plan. Therefore, all members of the Board's Human Resources Committee were Plan fiduciaries and acted in that capacity because they had and exercised (i) discretionary authority, control, or responsibility over Plan management or Plan administration and/or (ii) authority or control over management or disposition of Plan assets.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure on behalf of herself and the following Class of persons similarly
situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at
> any time during the "Class Period" and whose accounts included
> investments in Company Stock. Excluded from the Class are
> Defendants herein, the Company's Board of Directors throughout
> the Class Period, members of their immediate families, and their
> legal representatives, heirs, successors, or assigns, and any entity
> in which any Defendant has or had a controlling interest

33.     The members of the Class are so numerous that joinder of all members is
impracticable. While the exact number of Class members is unknown to Plaintiff at this time
and can be ascertained only through appropriate discovery. Plaintiff believes there are, at
minimum, thousands of members of the Class who participated in or were beneficiaries of the
Plan during the Class Period. For instance, Harley-Davidson's 2003 Form 5500 filed with the
Internal Revenue Service stated that, as of December 31, 2003, there were over 3,000 Plan
participants.

34.     Common questions of law and fact exist as to all members of the Class and
predominate over any questions affecting solely individual members of the Class. Among the
questions of law and fact common to the Class are:

> a.     whether Defendants each owed a fiduciary duty to the Plan and members
> of the Class;
>
> b.     whether Defendants breached their fiduciary duties to the Plan and
> members of the Class by failing to act prudently and solely in the interests
> of the Plan's participants and beneficiaries;

411159                                                   11

c.      whether Defendants violated ERISA; and

d.      whether the Plan and members of the Class have sustained damages and, if
so, what is the proper measure of damages.

35.      Plaintiff's claims are typical of the claims of the other members of the Class
because Plaintiff and the other members of the Class each sustained damages arising out of the
Defendants' wrongful conduct in violation of federal law as complained of herein.

36.      Plaintiff will fairly and adequately protect the interests of the members of the
Class and has retained counsel competent and experienced in class action, complex, and ERISA
litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.      Class action status in this ERISA action is warranted under Rule 23(b)(l)(B)
because prosecution of separate actions by the members of the Class would create a risk of
adjudications with respect to individual members of the Class which would, as a practical matter,
be dispositive of the interests of the other members of the Class or substantially impair or impede
their ability to protect their interests.

38.      Class action status is also warranted under the other subsections of Rule 23(b)
because: (i) prosecution of separate actions by the members of the Class would create a risk of
establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or
refused to act on grounds generally applicable to the Class, thereby making appropriate final
injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;
and (iii) questions of law or fact common to members of the Class predominate over any
questions affecting only individual members and a class action is superior to the other available
methods for the fair and efficient adjudication of this controversy.

## THE PRICE DROP OF HARLEY-DAVIDSON STOCK
## AND RESULTING INJURY TO THE PLAN

**Harley-Davidson Stock Soared as the Company Repeatedly**
**Touted Earnings Growth in the "Mid-Teens" and Expanding Motorcycle Shipments**

39.     Harley-Davidson makes approximately half of all motorcycles with 650 cc or larger engines sold in the U.S., and one in four sold worldwide.

40.     Founded over 100 years ago, Harley-Davidson dominated the American motorcycle market through the late 1970s. In the late 1970s and early 1980s, the Company teetered on the brink of failure. However, due to an enormously successful marketing effort, Harley-Davidson reclaimed a dominant position in the motorcycle market.

41.     By the late 1990s, demand for Harley-Davidson's motorcycles exceeded the supply.

42.     By September, 2001, Harley-Davidson's factories were said to be straining to keep up with demand. Harley-Davidson's motorcycle inventory shortfalls were no accident, but were instead engineered to permit demand to outpace supply to support the ever-increasing price of the motorcycles. Some dealers were able to charge 20% premiums over the Company's suggested retail price and force customers to wait up to 18 months to take delivery.

43.     A significant factor in the Company's success was that its core audience is the 45 year-old buyer. Upon information and belief, the median age of buyers of Harley-Davidson motorcycles is 47. The Company benefited enormously as its core market, buyers in their mid-forties, kept expanding as the baby-boomer generation entered their forties.

44.     In the six months preceding the start of the Class Period, Harley-Davidson repeatedly touted its record breaking financial performance, thereby providing several boosts to the Company's stock price. From January 21, 2004 to July 14, 2004, the Company's statements had driven up the stock price by approximately 37%.

45.     For example, on January 21, 2004, the Company touted record growth in a press release entitled, "Harley-Davidson Reports Record Fourth Quarter and 18th Consecutive Record Year." The press release announced a growth rate of approximately 15% for the foreseeable future:

> Harley-Davidson, Inc. today announced record revenue and earnings for its fourth quarter and year ended December 31, 2003.
>
> * * *
>
> "This is the 18th consecutive year that Harley-Davidson has achieved records for both revenue and net income," said Jeffrey L. Bleustein, chairman and chief executive officer of Harley-Davidson, Inc. "We had a phenomenal year full of memorable once-in-a-lifetime experiences surrounding our 100th Anniversary. Introducing the Harley-Davidson brand to hundreds of thousands of potential customers has undoubtedly sparked the dream of ownership and created new excitement for our products."
>
> "As we begin our 101st year, we expect to grow the business further with our proven ability to deliver a continuous stream of exciting new motorcycles, related products and services. We have set a new goal for the Company to be able to satisfy a yearly demand of 400,000 Harley-Davidson motorcycles in 2007. By offering innovative products and services, and by driving productivity gains in all facets of our business, we are confident that we can deliver an *earnings growth rate in the mid-teens* for the foreseeable future," said Bleustein.

(emphasis added).

46.     Following the earnings release, Harley-Davidson held an earnings conference during which Bleustein stated "[W]e continue to have confidence that our business can achieve an earnings growth rate in the mid-teens for the foreseeable future." Ziemer dismissed the already apparent reduction in sell through at dealers, stating that the drop was due both to a surge in demand a year earlier, commemorating Harley-Davidson's 100th anniversary, and the late

introduction of 2004 model motorcycles. On this news the Company's stock price increased from an opening price of $45.75 on January 21, 2004 to close at $47.41 on January 22, 2004.

47. On April 14, 2004, the Company issued a press release entitled "Harley-Davidson Roars Into Its Second Century With Another Record Quarter." The press release stated in relevant part:

> Harley-Davidson, Inc. today announced record revenue and earnings for its first quarter ended March 28, 2004.
>
> * * *
>
> "Harley-Davidson's first quarter performance clearly demonstrates that the Company is on track to deliver both the short and long-term performance objectives which we established earlier this year," said Jeffrey L. Bleustein, chairman and chief executive officer of Harley-Davidson, Inc.
>
> * * *
>
> "The Company's continuing strong performance supports our longer-range objectives to satisfy demand for 400,000 Harley-Davidson motorcycles in 2007 and to deliver an annual earnings growth rate in the mid-teens. Harley-Davidson's Board of Directors demonstrated their confidence in our stated direction by approving the repurchase of 7.8 million shares of stock during the quarter," said Bleustein.

48. Harley-Davidson's stock prices, which had opened at $55.50 on April 14, 2004, closed at $59.50 that day.

49. At the beginning of and during the Class Period, the Company continued to announce extraordinary financial results, which maintained the inflated price of Harley-Davidson Stock. For example, on July 14, 2004, the beginning of the Class Period, the Company issued a press release entitled, "Harley-Davidson's Second Century Momentum Builds With Another Record Quarter." The press release stated:

Harley-Davidson, Inc. today announced record revenue and earnings for its second quarter ended June 27, 2004.

* * *

"We are pleased to report another excellent quarter for Harley-Davidson," said Jeffrey L. Bleustein, Chairman and Chief Executive Officer of Harley- Davidson, Inc. "The record results we have delivered through the first six months of this year are in line with the Company's previously stated long-term direction of sustainable growth."

50.     Harley-Davidson Stock, which closed at $59.60 on July 13, 2004, closed up at $62.95 on July 14, 2004.

51.     During the Class Period, the Company continued to maintain an artificially high price for its stock with more announcements that earnings and motorcycle shipments were on target. For example, on October 13, 2004, the Company issued a press release entitled "Harley-Davidson, Inc. Reports Record Third Quarter: Company on Track to Achieve Record Year and Previously Stated Long-term Targets." The press release stated in relevant part:

Harley-Davidson, Inc. today announced record earnings for its third quarter ended September 26, 2004.

* * *

"We are pleased to report that Harley-Davidson has once again produced record revenue and earnings for the quarter," said Jeffrey L. Bleustein, Chairman and Chief Executive Officer of Harley-Davidson, Inc. "Our financial results for the first nine months of the year position us to deliver another record year and are in line with our previously stated long-term targets."

"We are enthusiastic about the reception of our recently introduced 2005 model year motorcycles, in particular the new Softail® Deluxe, the Screamin' Eagle® Custom Vehicles, the Sportster® 883 Low, and the redesigned Softail® Springer® Classic. Looking ahead to 2005, *we expect demand for Harley- Davidson motorcycles to continue to grow and support a wholesale unit target of 339,000 motorcycles,* which represents a 7 percent increase over this year's target," said Bleustein.

Case 2:05-cv-00912-CNC   Filed 08/25/05   Page 16 of 38   Document 1

(emphasis added).

52.    On January 20, 2005, the Company issued a press release entitled,

"Harley-Davidson Announces Record Fourth Quarter and 19th Consecutive Record Year;

Company Surpasses $5 Billion In Revenue." The press release stated:

> Harley-Davidson. Inc. today announced record revenue and
> earnings for its fourth quarter and year ended December 31, 2004.
>
> * * *
>
> "We expect to continue to grow in 2005 and *ship 339,000
> Harley-Davidson motorcycles during the year* to support that
> growth. This is consistent with our established goals of satisfying
> demand for 400.000 motorcycles in 2007 and generating an annual
> earnings growth rate in the mid-teens." said Bleustein.

(emphasis added).

The Company Knew that Its Statements Lacked a Reasonable Basis
Because Harley-Davidson Was Losing Market Share, Its Target Market
Was Shrinking, and Dealers Had More Inventory than They Could Sell

53.    Despite Defendants' best efforts to maintain the illusion that Harley-Davidson

motorcycles were in short supply, the Company was losing market share. In 2000, new U.S.

registrations of heavyweight motorcycles rose 22%, but Harley-Davidson's own sales declined

from 50.2% to 47.4% of those new registrations. Low-cost competitors like Honda were taking

the impatient customers away from Harley-Davidson.

54.    This drop in market share was consistent with the decline in the size of the

Company's target market, buyers in their mid-forties. As the baby-boomer generation entered

their fifties. the size of Harley-Davison's core market stopped expanding, but either stabilized or

was shrinking. As the size of the Company's core market is either stabilized or shrinking,

demand for Harley-Davidson motorcycles had either leveled off or was shrinking.

55.     In 2003, Harley-Davidson. which recognizes and reports revenue on motorcycle sales when they are shipped to retailers rather than when they are sold, shipped 63,000 more motorcycles than were actually sold.  Upon information and belief. that gap ballooned to 127,000 more shipped than sold in 2004.  Upon information and belief. during the first quarter of fiscal 2005 alone. Harley-Davidson shipped 76.000 more motorcycles into its sales channel, the dealers, than its dealers sold.

56.     Those ambitious shipments to dealers. coupled with income from the Company's historically profitable finance division, had helped Harley-Davidson regularly meet and beat Wall Street estimates.

57.     Meanwhile. while cramming too many motorcycles onto its dealers' showroom floors -- dealers who were afraid to tell Harley-Davidson "no" for fear of falling out of favor and not receiving allotments of future shipments -- HDFS reduced credit standards for C and D credit customers.  This reduction in credit standards further evidences that Harley-Davidson knew that sales were slowing and that action, such as reducing credit standards. was needed to try to boost sales.  As a result, however, of the reduction in credit standards. credit losses would increase from .77% to 1.07% in the first quarter of 2005.  Had Harley-Davidson not been lowering credit standards, dealers' sales would have declined even more.

58.     Thus, while the investment community was being led to believe Harley-Davidson was selling record numbers of motorcycles. its baby-boomer generation of customers was actually drastically slowing down their purchases. putting tremendous pressure on dealers. Demographics of customers went from reasonably affluent baby-boomers to younger and less affluent riders.  Dealers were forced to slash prices and sell to less credit-worthy purchasers (extending HDFS credit). cutting into their profit margins and drastically lowering the dealers'

incentive to bend to Harley-Davidson's demand that they continue accepting the ever-increasing number of bikes being forced upon them.

Harley-Davidson Slashed its Expected Earnings
and Announced a Reduction in Motorcycle Shipments

59.     Suddenly, on April 13, 2005, before the markets opened, the Company issued a press release entitled "Harley-Davidson Reports Record First Quarter; Moderates 2005 Motorcycle Shipment Growth Forecast." In that press release, the Company cut its forecast for earnings growth from the mid-teens to 5-8 percent. Harley-Davidson also announced that it would cut motorcycle shipments by 10,000 – an enormously significant change because it signaled to the public that the demand for Harley-Davidson motorcycles no longer outpaced the supply. Defendant Ziemer, in the press release, stated:

> U.S. retail sales of Harley-Davidson motorcycles during the first quarter of 2005 have been relatively flat with the same period last year – falling short of our expectations. Despite our continued optimism for the year, we feel it is prudent to limit short-term production growth, maintaining demand in excess of supply. This action will result in a change to our previous guidance for both shipments and earnings growth for 2005. Our shipments are now planned to increase from last year's 317,000 units to a target of 329,000 units compared to our original target of 339,000 units. Our 2005 earnings are expected to grow by approximately 5-8 percent in 2005 compared to our previous forecast of mid-teens earnings growth.

60.     The Company's press release also stated:

> Motorcycle Retail Sales Data
>
> In the United States through March, Harley-Davidson retail motorcycle sales finished down approximately one percent compared to 2004. Similarly, the U.S. heavyweight motorcycle market declined 0.4 percent in the first quarter.

* * *

Case 2:05-cv-00912-CNC   Filed 08/25/05   Page 19 of 38   Document 1

Financial Services Segment

Annualized credit losses on a managed portfolio basis increased during the quarter to 1.07 percent in 2005 from 0.77 percent in 2004 due to the combination of a higher incidence of losses and lower recovery rates. HDFS is maintaining its credit loss target of 1 percent or less of managed receivables.

* * *

Shipment Guidance

Harley-Davidson is revising its previous guidance and now plans to ship 329,000 Harley-Davidson motorcycles in 2005. This 329,000 unit target represents a 3.7 percent growth rate over 2004 shipments. The Company believes that this 10,000 unit reduction will occur almost entirely in the second quarter and will involve reducing planned production of 2005 Model Year motorcycles. Revised quarterly shipments are expected to be as follows: 77,000 units in the second quarter, 87,500 units in the third quarter and 87,500 units in the fourth quarter.

61.     Defendant Ziemer also admitted during the Company's earnings conference that the Company would not likely reach its lofty goals of shipping 400,000 motorcycles in 2007.

62.     As the market absorbed this major disappointment, Harley-Davidson's stock price, which had closed at $58.77 on April 12, 2005, plunged by over 23% in the next several trading days.

## CAUSATION

63.     The Plan suffered at least tens of millions of dollars in losses because substantial assets of the Plan were imprudently allowed to be put at great risk by Defendants, through investment by the Plan in Harley-Davidson Stock during the Class Period, in breach of Defendants' fiduciary duties.

64.     Defendants are responsible for losses caused by participant direction of investment in Harley-Davidson Stock because Defendants failed to take the necessary and

required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA Section 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants concealed material, non-public facts from participants and provided misleading, inaccurate, and incomplete information to them regarding the nature of the Defendants' improper activities and therefore the ongoing earnings levels of Harley-Davidson, as well as the true underlying values of Harley-Davidson Stock offered by the Plan, misrepresenting its soundness as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in Harley-Davidson Stock and Defendants remain liable under ERISA for losses caused by such investment.

65.     Moreover, Defendants are responsible for the losses caused by participant direction of investment in Company Stock because Defendants should have acted to protect the Plan participants and beneficiaries when investing in Company Stock became imprudent. The Defendants should have refrained from offering Harley-Davidson Stock as an investment option and diversified the Plan's investments out of Harley-Davidson Stock.

66.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Harley-Davidson Stock and divesting the Plan from Company Stock offered by the Plan when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Company Stock.

67.     Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Harley-Davidson Stock offered by the Plan, eliminating this investment when it became imprudent, and divesting the Plan from any then-existing investments in this investment when

maintaining such investment became imprudent. the Plan would have avoided a substantial portion of the losses that it suffered through such continued tainted investment.

**COUNT I**
**(as against all Defendants)**

**Breach of Fiduciary Duty of Care**
**ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)**

68.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     At all times relevant hereto, ERISA Section 404(a)(1)(B). 29 U.S.C. § 1104(a)(1)(B), required Defendants to act. with respect to the Plan, with the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use in managing an enterprise of like character and with like aims.

70.     During the Class Period. Defendants breached their duty of care.  They failed to act prudently and failed to use reasonable care. skill, or diligence in offering Harley-Davidson Stock as an investment option. purchasing Harley-Davidson Stock for the Plan, making matching contributions of Harley-Davidson Stock. monitoring the Plan's investment in Harley-Davidson Stock, restricting the ability of Plan participants to diversify out of Company Stock, and communicating information concerning Harley-Davidson's financial performance to Plan participants and beneficiaries.

71.     Harley-Davidson Stock was an inappropriate Plan investment as it traded at artificially high prices during the Class Period due to, among other things, misinformation distributed by the Defendants concerning Harley-Davidson's earnings growth and anticipated motorcycle shipments that had driven up the stock price by approximately 37% during the six months preceding the start of the Class Period.

72. At all relevant times. Defendants knew, or failed to learn through an adequate investigation, of the above-mentioned facts, which made Harley-Davidson Stock an imprudent Plan investment.

73. An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Harley-Davidson Stock was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

74. Defendants also knew that the price of Company Stock would trade at a discount once the market became aware that the Company had overstated both earnings growth and anticipated motorcycle shipments. Yet. Defendants failed to impute this knowledge to the Plan and Plan participants and continued to cause the Plan to offer Company Stock as an investment option and to acquire and retain shares of Company Stock.

75. Defendants failed properly to take into account the numerous practices that put Harley-Davidson Stock at risk as well as the fact that Harley-Davidson Stock was inflated in value when determining the prudence of investing and holding Plan assets in Harley-Davidson Stock.

76. As a result of Defendants' knowledge of and. at times, participation in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification made to Plan participants did not effectively inform Plan participants of the past. immediate, and future dangers of investing in Company Stock.

77. Because Defendants knew or should have known that Company Stock was an imprudent investment for the Plan. they had an obligation to protect the Plan and its participants

from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company Stock.

78.    Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary: not offering Company Stock as an investment option; divesting the Plan of Company Stock: consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve participants in the Plan in connection with the Plan's acquisition and holding of Company Stock.

79.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of Plan investment in Harley-Davidson Stock.

80.    Under ERISA. Defendants were responsible for ensuring that all Plan investments in Company Stock were prudent and are liable for losses incurred as a result of such investments being imprudent.

81.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA Section 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the Plan, to do so.

82.     Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that Harley-Davidson Stock was not a suitable and appropriate investment for the Plan. Nonetheless, during the Class Period, these fiduciaries continued to offer the Harley-Davidson Stock as an investment for the Plan and to direct and approve Plan investment in Harley-Davidson Stock. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Harley-Davidson Stock.

83.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its assets and retirement investments.

84.     Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### COUNT II
### (as against all Defendants)

### Breach of Fiduciary Duty to Provide Complete and Accurate Information
### ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

85.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

86.     The fiduciary duties of loyalty and prudence also entail a duty to deal candidly with Plan participants and beneficiaries. This duty of candor requires Plan fiduciaries to provide complete and accurate information concerning the Plan's investment options, including the

411159                                    25

financial performance of Harley-Davidson, to Plan participants and beneficiaries. This duty

under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them

regarding the Plan or Plan assets, and to disclose material information that participants need in

order to exercise their rights and interests under the Plan. This duty to inform participants

includes an obligation to provide participants and beneficiaries of the Plan with complete and

accurate information, and to refrain from providing false information or concealing material

information regarding Plan investment options, such that participants can make informed

decisions with regard to the prudence of investing in such options made available under the Plan.

This duty applies to all Plan investment options, including investment in Harley-Davidson Stock.

87. As of December 31, 2004, more than 35% of the Plan's assets were invested in

Harley-Davidson Stock. Because investment in the Plan was not diversified (i.e., the Defendants

chose to invest the Plan's assets and/or allow those assets to be invested heavily in Harley-

Davidson Stock), such investment carried with it an inherently high degree of risk. This inherent

risk made the Defendants' duty to provide complete and accurate information particularly

important with respect to Harley-Davidson Stock.

88. The Defendants breached their duty to disclose material information to Plan

participants and beneficiaries by failing to provide complete and accurate information regarding

Harley-Davidson Stock, Harley-Davidson's true earnings growth, the widening gap between

Harley-Davidson's motorcycle shipments and actual sales by dealers, the reduction in credit

standards by HDFS, and the consequent artificial inflation of the value of Harley-Davidson

Stock. Defendants also failed to convey accurate information regarding the soundness of Harley-

Davidson Stock and the prudence of investing retirement contributions in Harley-Davidson

equity. These failures were particularly devastating to the Plan, and thus Plan participants and

beneficiaries, because losses in Harley-Davidson Stock had an enormous impact on the value of participants' retirement assets.

89.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance and prospects of both the Company and Company Stock. During the Class Period, the Company fostered a positive attitude toward Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company Stock. As such, participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

90.    Defendants failed to provide Plan participants with material information regarding Harley-Davidson Stock, such that the participants could appreciate the true risks presented by investments in Harley-Davidson Stock and could make informed decisions regarding investments in the Plan.

91.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts, and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Harley-Davidson Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Harley-Davidson Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to

their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

92.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

93.     Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III
### (as against all Defendants)

### Breach of Fiduciary Duty of Loyalty to Avoid Conflicts of Interest
### ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)

94.     Plaintiff incorporates the allegations set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

95.     At all relevant times, ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), required Defendants to act solely in the interests of the Plan participants and beneficiaries, including Lisa Bosman, and for the exclusive purpose of providing benefits to the Plan participants and beneficiaries.

96.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the Plan and its participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

97.     Defendants breached their duty of loyalty owed to the Plan and the Class members.

98.     Defendants had significant personal investments in Harley-Davidson Stock.

99.     The Company requires that its Directors hold at least 5.000 shares of Harley-Davidson Stock. which must be acquired within five years from the date of the individual's election as a director.

100.    The Company requires that its senior executives hold a stated minimum number between 5.000 to 30.000 shares of Harley-Davidson Stock.

101.    The following table depicts, as of January 31. 2005, the significant personal investments of certain Defendants in Harley-Davidson Stock:

| Name | Number of Shares | Value of Shares | Shares Issuable upon Exercise of Stock Options |
|---|---|---|---|
| Allen | 30.080 | $1,808,109 | 5,500 |
| Beattie | 18,100 | $1.087,991 | 5,500 |
| Bleustein | 1,359,630 | $81.727.359 | 603,750 |
| Conrades | 8.553 | $514,121 | 1.800 |
| Green | 877 | $52.716 | 0 |
| James | 227.129 | $13,652.724 | 5,500 |
| Lione | 178.317 | $10.718.635 | 160.090 |
| Levinson | 14,603 | $877.786 | 5,500 |
| Miles | 3,030 | $182.133 | 0 |
| Norling | 18,808 | $1,130,549 | 5.500 |
| Ziemer | 502.914 | $30.230,161 | 224,524 |

102.    During the Class Period. a significant portion of the compensation received by defendants Bleustein, Lione, and Ziemer was in the form of options for Harley-Davidson Stock.

103.    During the Class Period, Defendants Brostowitz, Bleustein, Lione, and Ziemer collectively sold millions of dollars worth of their individual holdings of Harley-Davidson Stock.

104.    Thus, Defendants had a significant personal financial incentive to maintain a high price for Harley-Davidson Stock.

105.    Defendants had an incentive not to disclose negative financial results to the Plan participants in hopes that such participants would select Harley-Davidson Stock for their retirement portfolios and therefore help maintain a high price for Harley-Davidson Stock.

106.    Defendants also had an incentive to maintain Harley-Davidson Stock as an investment option under the Plan. If Company Stock were eliminated as an investment option under the Plan, this would have sent a negative signal to Wall Street analysts, which in turn would result in reduced demand for Harley-Davidson Stock and a drop in the stock price. Since the compensation and wealth of the Defendants was tied to Harley-Davidson Stock, this sequence of events would negatively impact their personal finances.

107.    As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest in maintaining an artificially high price for Harley-Davidson Stock and the interests of the Plan participants and beneficiaries to avoid having their retirement portfolios invested in Harley-Davidson Stock when it was imprudent to do so and to receive accurate information concerning Harley-Davidson upon which to base their investment decisions.

108.    Defendants also breached their fiduciary duty of loyalty because they endorsed unreasonable growth estimates for Harley-Davidson. Such endorsement was in the interests of Defendants to maintain an artificially high price for Harley-Davidson Stock, but was detrimental

to the interests of the Plan participants and beneficiaries who were holding and continuing to invest in Harley-Davidson Stock based upon misinformation.

109.    Defendants also breached their fiduciary duty of loyalty because they did not timely disclose negative financial information. Such non-disclosure aided the interests of the Defendants in maintaining an artificially high price for Harley-Davidson Stock, but ran against the interests of the Plan participants and beneficiaries who were holding and continuing to invest in Harley-Davidson Stock based upon misinformation.

110.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

111.    Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV
### (as against Harley-Davidson and the Director Defendants)

### Breach of Fiduciary Duty to Monitor and Investigate
### ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)

112.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

113.    At all relevant times, ERISA Section 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), required Defendants to monitor other fiduciaries.

114.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that Defendants had the duty to:

Case 2:05-cv-00912-CNC   Filed 08/25/05   Page 31 of 38   Document 1

(i)     ensure that the monitored fiduciaries possessed the needed credentials and experience or used qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan participants;

(ii)    ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(iii)   ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(iv)    ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan investments;

(v)     ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

(vi)    ensure that the monitored fiduciaries reported regularly to the Company.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

115.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

116.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are

doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

117. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

118. Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's true financial performance and growth prospects, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified investment like Harley-Davidson Stock. Defendants knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the Harley-Davidson Stock as a Plan investment, and to continue investing in Harley-Davidson Stock when it no longer was prudent to do so, yet failed to take action, such as replacing the monitored fiduciaries, to protect the participants from the consequences of these fiduciaries' failures.

119. In addition, Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Administrative Committee to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

120.    In addition. Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of Harley-Davidson that it knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries. Defendants breached their monitoring duties under the Plan and ERISA.

121.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

122.    Pursuant to ERISA Sections 409 and 502(a). 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT V**
**(as against all Defendants)**

**Co-Fiduciary Liability**
**ERISA Section 405(a), 29 U.S.C. § 1105(a)**

123.    Plaintiff incorporates the allegations set forth in paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    ERISA Section 405(a). 29 U.S.C. § 1105(a). may impose liability upon a fiduciary for a breach of fiduciary responsibility committed by another fiduciary.

125.    Each Defendant is also liable as co-fiduciaries because they (1) knowingly participated in and knowingly undertook to conceal (i) the failure of the other fiduciaries to provide complete and accurate information regarding Harley-Davidson Stock, (ii) the conflict of interest facing the other fiduciaries. (iii) the failure to monitor and investigate Plan investments,

(iv) the imprudence of the Plan investing in Harley-Davidson Stock, and (v) the failure to diversify the Plan investments; (2) enabled other fiduciaries to breach their duties as a result of each Defendant's own failure to satisfy his or her fiduciary duties; and (3) had knowledge of the other fiduciaries' failures to satisfy their fiduciary duties, yet did not make any effort to remedy the breaches.

126. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of its retirement investments.

127. Pursuant to ERISA Sections 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT VI**
**(as against Harley-Davidson)**

**Knowing Participation in a Breach of Fiduciary Duty**

128. Plaintiff incorporates the allegations set forth in paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129. To the extent that Harley-Davidson is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Harley-Davidson knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity. As such, Harley-Davidson is liable for equitable relief as a result of participating in such breaches.

130. Harley-Davidson benefited from the breaches by discharging its obligations to make contributions to the Plan by contributing Company Stock to the Plan or selling Company Stock to the Plan while the value of such stock was inflated. Accordingly, Harley-Davidson may

be required to disgorge this benefit or may be subject to other equitable relief, such as restitution to the Plan.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

131.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company Stock.

132.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

133.    ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA Section 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

134.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the value of the plan's assets to what they would have been if the plan had been properly administered.

135.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA Section 409(a). 29 U.S.C. § 1109(a): (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA Sections 409(a) and 502(a)(2-3). 29 U.S.C. §§ 1109(a) and 1132(a)(2-3): (3) reasonable attorney fees and expenses, as provided by ERISA Section 502(g), 29 U.S.C. § 1132(g). the common fund doctrine and other applicable law; (4) taxable costs and (5) interests on these amounts. as provided by law: and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants. jointly. severally, or individually in the alternative, as follows:

A.      a declaration that Defendants. and each of them. have breached their ERISA fiduciary duties to the Participants:

B.      an order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties. including losses to the Plan resulting from imprudent investment of the Plan's assets. and to restore to the Plan all profits the Defendants made through use of the Plan's assets. and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty:

D.      an order enjoining Defendants. and each of them. from any further violations of their ERISA fiduciary obligations:

E.      actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses:

Case 2:05-cv-00912-CNC   Filed 08/25/05   Page 37 of 38   Document 1

F.     an order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in Company Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price/value of Company Stock;

G.     an order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     an order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     an order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

**JURY TRIAL DEMAND**

Plaintiffs demand a trial by a jury of twelve persons as to all contested issues of fact.

DATED: August 23, 2005

_Noah Krasner_

Noah Golden-Krasner Wis. Bar. No. (1047054)
LAW OFFICES OF NOAH GOLDEN-KRASNER
354 West Main Street
Madison, WI 53703
Tel: (608) 232-1601
Fax: (608) 442-9494

Mark C. Rifkin
Jeremy M. Weintraub
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Thomas J. McKenna
GAINEY & McKENNA
485 Fifth Avenue, 3rd Floor
New York, NY 10017
(212) 983-1300

Attorneys for Plaintiff Lisa Bosman

411159                                         38